UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                        Plaintiff,

        -v.-                                                        1:06-CR-411
                                                                      (LEK)

RAYMOND VANHOESEN, a/k/a SHAM, and
JERMAINE VANHOESON a/k/a WALEEK
                                        Defendants.
_____

## MEMORANDUM-DECISION AND ORDER[1]

        Defendant Jermaine VanHoesen ("Defendant") is accused of possession with intent to

distribute crack cocaine in violation of 21 U.S.C. § 846 and, together with his co-defendant

Raymond VanHoesen, conspiracy to possess with intent to distribute crack cocaine, in violation of

21 U.S.C. § 841(a)(1) and (b)(1)(B).   Indictment (Dkt. No. 12).  On March 11, 2008, an evidentiary

hearing was held to determine whether there was probable cause for Defendant's warrantless arrest

on February 20, 2003 and, accordingly, whether evidence seized that day, including drugs and cash,

must be suppressed.

### I.  Background

        Defendant was arrested on February 20, 2003 in Albany, NY.  Defendant maintains that on

that date he drove to the Charter School in Albany to pick up someone named Reno Conley and give

him a ride, as a favor to his cousin.  After Defendant arrived at the location on Second Street and

while he was waiting for Conley, a black SUV with tinted windows approached.  The SUV

contained police officers who had set up a "rip" operation, using an informant to arrange a drug

_____

        [1] For printed publication by the Federal Reporters.

1

deal.  Defendant backed his car up through an alley to escape, supposedly fearing that the car

contained assailants attempting to shoot him, as had happened before.  In doing so, Defendant

backed into a different police car which was blocking the alley and which had its emergency lights

on.  Defendant fled the area and was allegedly observed throwing something from the window.

Defendant pulled over a short while later on Clinton Avenue and was taken into custody.  Police

officers collected items from the vehicle and the person of Defendant, including cocaine, a cell

phone, pager, cash, and paperwork.  Police also later found a quantity of cocaine on North Swan

street, where Defendant allegedly tossed the item.

## II.  Analysis

A.    The Initial Stop of Defendant's Vehicle on Second Street and the Subsequent Arrest
      on Clinton Avenue

      1.    Standard of Law for Probable Cause

"A warrantless arrest of an individual in a public place for a felony, or a misdemeanor

committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is

supported by probable cause."  Maryland v. Pringle, 540 U.S. 366, 370 (2003), quoted by U.S. v.

Baldwin, 496 F.3d 215, 220 (2d Cir. 2007).  "Probable cause is 'a fluid concept . . . not readily, or

even usefully, reduced to a neat set of legal rules.'"  Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir.

2007) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  Probable cause "requires only such

facts as make wrongdoing or the discovery of evidence thereof probable."  Id. at 157.  If "there is no

dispute as to what facts were relied on to demonstrate probable cause, the existence of probable

cause is a question of law for the court."  Id. (internal citations omitted).

"Probable cause is not a particularly demanding standard."  United States v. Solomonyan,

2

452 F.Supp.2d 334, 343 (S.D.N.Y. 2006). Probable cause merely "requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal citations omitted). Probable cause is determined by looking at what facts the officer had available at the time of, and immediately prior to, arrest. Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002).

     2.     The Officers' Information

Defendant alleges that the information leading to the police presence by his car was an unsubstantiated statement from an unreliable informant. However, the testimony at the evidentiary hearing showed that there was significant justification for the police presence by Defendant's car, for the subsequent approach and chase of Defendant, and for the ultimate arrest.

The testimony of Sergeant Roberts established that Defendant's arrest stemmed from a "rip-off" operation planned with a confidential informant. Roberts Test. (Dkt. No. 68). The informant, who had been taken into custody on an outstanding warrant, offered to call some drug suppliers he had conducted business with in the past, in exchange for Sergeant Roberts notifying the District Attorney's office that the informant provided information. Id. at 9. After unsuccessfully attempting to call one alleged supplier, the informant and Sergeant Roberts agreed to target an individual named Sham, who was allegedly the informant's typical drug supplier. Id. at 10-11. Sergeant Roberts was already familiar with Sham. Id. at 11. Because Sham (allegedly an alias for co-defendant Raymond VanHoesen) was not doing business at the time due to pending court action, the operation focused instead on an individual named "Homie" who, according to the informant, had taken over Sham's business. Id. at 11. The informant stated that he had dealt with Homie on a few

3

occasions, described Homie's physical appearance and stated that Homie typically drove a white Chevrolet Blazer-type vehicle of 1990's vintage with a black tire mount on the back hatch.  Id. at 12-13.  The informant also described the typical "meet" location and transaction procedure for buying drugs from Homie.  Id. at 13.

Along with the informant, Sergeant Roberts called the number provided by the informant for Homie's pager and entered the informant's cell phone number, along with a code: "eight zero zero." Id. at 15.  According to the Government, Defendant then called the informant's cell phone, confirmed the informant's identity, and agreed to meet at the Second Street meet location.  Id. at 15-16.  Defendant then called again to confirm that the informant wanted "the eight" that had been put in the pager before.  Id. at 16.  Subsequently, the informant called the cell phone Defendant had been using and stated "I'm 75 short," which the informant told Sergeant Roberts was a code confirming that the deal would happen.  Id. at 18.  Defendant then responded "okay."  Id.

Sergeant Roberts testified that, along with nine other officers placed around the meet location, he and the informant parked on Second Street in Albany to observe Homie's arrival.  Id. at 20.  After approximately fifteen minutes, Defendant arrived at the meet location driving a white Chevrolet Blazer.  Id. at 23-24.  Defendant then called the informant's cell phone and asked where he was.  Id.  At Sergeant Roberts' directive, a black Blazer with Detectives Monte and Vincent pulled in front of Defendant's vehicle, blocking the exit to the street.  Id. at 25; Vincent Test. at 68-69 (Dkt. No. 68).  Detective Vincent exited the vehicle and began to approach Defendant, with both his bullet-proof vest, marked "POLICE" and his badge (on a neck chain) visible.  Roberts Test. at 25-26 (Dkt. No. 68); Vincent Test. at 69-70 (Dkt. No. 68).  Detective Vincent recognized Defendant and noted that Defendant's eyes became wide upon seeing him, possibly indicating Defendant's

4

recognition of Detective Vincent.  Id. at 69, 72.  At that point, Defendant's vehicle began to move

down the alleyway, in reverse, away from Detective Vincent.  Roberts Test. (Dkt. No. 68) at 26;

Vincent Test. (Dkt. No. 68) at 73-74.

After Defendant started backing up through the alley, Detective Vincent got back in his

vehicle, which Detective Monte drove down the alley, following Defendant.  Vincent Test. (Dkt.

No. 68) at 74.  Detective Vincent observed the vehicle driven by Defendant strike a vehicle

occupied by Sergeant Chambers, which was located at the end of the alley on Third Street.  Id.

Detective Vincent characterized the condition of Sergeant Chambers' vehicle after the collision as

"heavily damaged" and "pretty much undriveable."  Id. at 75.  The vehicle struck by Defendant had

emergency lights flashing.  Id. at 74, 80; Monte Test. (Dkt. No. 68) at 111.  After the collision,

Defendant drove quickly from the scene, leading Detectives Vincent and Monte on a chase down

Third Street , North Swan Street,  Livingston Street, and Ten Broeck Street before finally pulling

over on Clinton Avenue.  Id. at 75-76.  At that point, Defendant was arrested.

3.      Probable Cause to Arrest Defendant on Second Street

Probable cause exists if, under the totality of the circumstances, there are "facts as make

wrongdoing or the discovery of evidence thereof probable."  Walczyk v. Rio, 496 F.3d at 157.

Where an informant's statements form the basis of a law enforcement officer's assessment of

probable cause, the informant's "veracity, reliability and basis of knowledge" are among several

relevant considerations to be balanced, as is the extent to which the informant's statements are

corroborated by independent police work.  Illinois v. Gates, 462 U.S. 213, 230, 241-42 (1983); see

United States v. Gagnon, 373 F.2d 230, 236 (2d Cir.2004); Caldarola v. Calabrese, 298 F.3d 156,

162-63 (2d Cir.2002).  Nonetheless, the absence of a "proven track record [of truthfulness or

accuracy] with the police" is an insufficient basis to doubt the informant's veracity.  United States v. Canfield, 212 F.3d 713 (2d Cir.2000) (citation omitted).  Information provided by a named informant is generally considered more reliable than information provided by an "anonymous tipster."  See Canfield, 212 F.3d at 719; see also United States v. Salazar, 945 F.2d 47, 50 (2d Cir.1991) (informant who speaks directly to officers is more accountable than anonymous tipster and therefore likely more reliable).  If an informant's information has been "corroborated in material respects, the entire account may be credited, including parts without corroboration."  Canfield, 212 F.3d at 720.

Taken together, the information provided to the police by the informant, coupled with the phone calls between the informant and Defendant that the police listened to and recorded, and the arrival of Defendant at the place described, at the expected time and in the car described, provided probable cause to believe that a crime was about to be committed or that evidence of a crime would be found.  Although the reliability of the informant is important to the Court's determination, a sufficient basis existed upon which to conclude that his information was credible.  First, the fact that he was not an anonymous informant is a factor worthy of consideration and one that weighs in favor of crediting his information.  See, e.g., Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (distinguishing between anonymous tip and tip from "known informant whose reputation can be assessed and who can be held responsible if her allegations turned out to be fabricated"); United States v. Colon, 111 F.Supp.2d 439, 442 (S.D.N.Y. 2000) (information provided during 9-1-1 call was sufficient to establish reasonable suspicion for traffic stop because caller provided personal information "which on the face of it, indicates that she believe[d] she was identifiable to the police" and thereby "subjected herself to the risks of adverse consequences in the

event that the tip proved to be false"), *vacated on other grounds*, 250 F.3d 130 (2d Cir. 2001).  The

informant here was not promised any actual leniency in exchange for his information, and could

have faced adverse consequences if his information turned out to be false.

The information provided by the informant was corroborated by the events that occurred

over the next few hours after he provided the information to the police, indicating that he had

reliable inside information.  Defendant arrived at the pre-described and agreed-upon location, in the

car that the informant had described, at the time expected, and his arrival was followed by a call to

the informant to inquire as to the informant's whereabouts.  Other information provided by the

informant about Sham, the Defendant's cousin and co-Defendant, was also consistent with

information the police already had.  The Court thus finds that there was probable cause for the

police to arrest Defendant at the time that the police approached Defendant on Second Street.

4.      Reasonable Suspicion to Stop Defendant on Second Street

The Court notes that, at the very least, the police had sufficient reasonable suspicion to stop

Defendant on Second Street.[2]  Under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and its progeny, a law

enforcement officer may detain a person for investigative purposes "if the officer has a reasonable

suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer

lacks probable cause."  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).  Reasonable suspicion

determinations under <u>Terry</u> and its progeny are assessed on the totality of the circumstances

supporting the investigatory stop.  <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981); <u>United</u>

<u>States v. Muhammed</u>, 463 F.3d 115, 121 (2d Cir.2006).  As noted by the Second Circuit in

---

[2] As discussed in more detail infra section B.2.b., Defendant was not actually seized until he
pulled over and was arrested on Clinton Avenue.

Muhammed, "an officer may 'draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person.'"  463 F.3d at 121 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal citations and quotations omitted)).

"Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.'"  United States v. Elmore, 482 F.3d 172, 179 (2d Cir.2007) (quoting Adams v. Williams, 407 U.S. 143, 147 (1972)).  As noted by the Second Circuit in Elmore, "courts must assess whether an informant's tip establishes reasonable suspicion under the totality of the circumstances approach set forth in Illinois v. Gates, 462 U.S. 213 (1983), though obviously a lesser showing is required."  Id.  "The informant's 'basis of knowledge' and 'veracity' (i.e., how he knows and why we should believe him) remain highly relevant to a determination of either probable cause or reasonable suspicion."  Id. (citing Alabama v. White, 496 U.S. 325, 328-29 (1990)).  The Court noted that, even if "the informant's tip, standing alone, lacks sufficient indicia of reliability because it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of reasonable suspicion if sufficiently corroborated through independent police investigation."  Id. (citing Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)).

In Alabama v. White, the Court held that an anonymous tip (which by itself would not have justified an investigative stop) justified a Terry stop because both innocent details and predictive information were corroborated.  496 U.S. at 329, 331-32; see also Elmore, 482 F.3d at 180 (reversing suppression where the informant "gave the police enough information about herself to allow them to identify her and track her down later to hold her accountable if her tip proved false").

The police in <u>White</u> observed conduct predicted accurately by the tip (that the suspect would leave an apartment at a particular time and drive to a particular place carrying drugs), confirming that the tipster had insider knowledge about the suspect and her criminal activity that made the tipster credible.  496 U.S. at 332.

In this case, the informant's tip was detailed, he gave the police some information they already knew, and the rest of the information was corroborated by conduct that the police observed as part of the "rip" operation.  Although the Court finds that the police had probable cause to arrest the Defendant when they approached his vehicle and attempted to stop him on Second Street, the Court notes that the Government has also made the lower-required showing of establishing reasonable suspicion for a <u>Terry</u> stop.

     5.     Probable Cause to Arrest Defendant on Clinton Avenue

Defendant was arrested after he pulled over on Clinton Avenue.  The Court finds that the police had probable cause to arrest the Defendant at that point based on the informant's information, the corroboration by the police, and the events which occurred after the initial attempt to stop Defendant on Second Street.

Although flight alone is generally not sufficient to justify a stop or pursuit, Defendant's flight may be considered in conjunction with other attendant circumstances such as time and location, as well as the police officers' knowledge that a crime had been committed, to establish probable cause.  <u>See</u> <u>Sibron v. State of New York</u>, 392 U.S. 40, 66-67 (1968) ( "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.");

United States v. Martinez-Gonzalez, 686 F.2d 93, 98 (2d Cir. 1982) (defendant's unexpected appearance and precipitous retreat when agents identified themselves as police established probable cause).

The facts in this case illustrate that Defendant's arrest was justified in that Police had probable cause to believe that a felony has occurred. Additionally, Defendant's reckless driving and failure to stop after a collision, both observed by several police officers, gave the police independent justification to arrest Defendant on Clinton Avenue. The probable cause to arrest Defendant came not only from his highly suspicious and illegal attempt to flee, but also from the informant's information, which was confirmed and supported by the coded phone conversations between the informant and Defendant, the verified description of Defendant's car, and the police observation of Defendant's use of the cell phone used by "Homie."

B.    Evidence Seized

Defendant also seeks to suppress evidence seized from (1) inside his vehicle – a "white chunky substance" later determined to be cocaine, a cell phone and paperwork, (2) his person – $2753 in U.S. currency, a pager and another cell phone, and (3) the city streets – cocaine the government asserts was thrown by Defendant out of his car window while he was attempting to flee the police. Defendant argues that all of the property was seized as the result of the police's illegal seizure and that, therefore, it should be suppressed.

1.    Facts

Detective Vincent testified that, as he and Detective Monte pursued the Defendant, as described above, he saw a plastic bag come out of the driver's side window of the vehicle driven by

Defendant.  Vincent Test. (Dkt. No. 68) at 76.  He observed the bag drop onto the ground by

Defendant's vehicle as it turned from Livingston Street to Ten Broeck Street.  Id.  After Defendant

pulled over and was taken into custody, Detective Vincent instructed two other officers, Detective

Coons and Connery "to go back to Ten Broeck Street, maybe four or five houses southbound of

Livingston Avenue, and . . . see if they could find the bag."  Id. at 78.  Detective Connery recovered

two plastic "ties," each of which contained crack cocaine.  Additionally, Officer Crossman was

instructed to walk the route that Defendant had taken in attempting to escape the police, and he

thereby discovered an additional quantity of crack cocaine in the vicinity of North Swan Street and

Third Street.  Id. at 79.

        After Defendant pulled over, Detective Monte and Vincent approached his vehicle.  Monte

Test. (Dkt. No. 68) at 114.  When Detective Monte opened the door on the driver's side of the

vehicle, he noticed that there was a quantity of white chunky crumbs in Defendant's lap and seat, as

well as on the floor and interior door handle of the driver's area of the vehicle.  Id. at 115.

Detective Monte picked up some chunks of the substance from Defendant's lap and kept them in his

hand until Defendant was secured.  Id. at 115-116, 132-33.  Detective Monte then retrieved an

evidence bag and collected the remaining pieces from the car, as well as a cell phone and some

papers.  Id. at 116, 133.  During the arrest, Defendant was searched by Detective Gottesman; $2,753

in United States Currency was found in Defendant's pants pocket along with a pager and another

cell phone.  Id. at 116.

        2.  Analysis

                a.      Items Seized From Defendant's Car and Person

        Evidence seized incident to arrest is admissible, assuming that the arrest was supported by

probable cause.  U.S. v. Baldwin, 496 F.3d 215, 220 (2d Cir. 2007).  Because Defendant's arrest was based on probable cause and thus constitutionally permissible, the frisk of Defendant and the search of the passenger area of his car were also valid.  The search incident to arrest doctrine allows a warrantless search of an "arrestee's person and the area 'within his immediate control'--construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."  Chimel v. California, 395 U.S. 752, 763 (1969) (internal citations omitted).  The purpose of the doctrine is to prevent harm to the arresting officer and to prevent the destruction or concealment of incriminating evidence.  Id.  Additionally, in 1981, the Supreme Court established a bright-line rule that permits arresting officers to search the passenger compartment of a vehicle upon the arrest of "a recent occupant" of that vehicle.  New York v. Belton, 453 U.S. 454, 457 (1981).  The Court reasoned that an arrestee could potentially reach into the passenger compartment in order to secure a weapon or destroy evidence, even when the "recent occupant" is already under arrest at the time of the search.  Id.  Thus, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  Id.

The search in question here fits within the rule established in Belton.  All of the evidence introduced at the suppression hearing indicated that Defendant was in the custody of the arresting officers when they searched his person and car, and he was in the immediate vicinity of the car when it was searched.  Defendant's argument seeking to suppress the evidence seized from his car and person is linked to his argument that the police lacked probable cause to arrest him.  As discussed above, the police had probable cause to arrest Defendant and both their search of Defendant and his car and the seizure of evidence incident to that arrest are thus constitutional.  Accordingly,

Defendant's Motion to suppress the items seized from his vehicle and from his person is denied.

        b.     Drugs

The police were justified in their attempt to stop Defendant on Second Street, as discussed above, and thus to pursue him when he fled. In addition, Defendant has no expectation of privacy in any property he abandoned while being pursued by the police.

When an individual has abandoned property, he no longer has any expectation of privacy in the property, such as would be protected by the Fourth Amendment. California v. Hodari D., 499 U.S. 621, 629 (1999) ("there was no seizure in the sense of the law when the officers examined the contents of each [object] after they had been abandoned."); United States v. Welbeck, 145 F.3d 493, 498 (2d Cir. 1998) ("A warrantless seizure of abandoned property does not offend the Fourth Amendment."); U.S. v. Belk, 174 F.Supp.2d 138, 143-4 (S.D.N.Y. 2001) ("by discarding the weapon, [defendant] had abandoned any expectation of privacy in it, removing from Fourth Amendment protection any interest he had in it.").

In Hodari D., two police officers were on routine patrol in a high crime area in Oakland, California. 499 U.S. at 622. The officers were in civilian clothing and were traveling in an unmarked car, but had jackets bearing the word "Police" on both front and back. Id. As the officers came around a corner, they noticed four or five youths surrounding a car which was parked at the curb. Id. When the youths saw the officers, they fled. Id. at 622-23. One officer remained in the car, while the other gave chase on foot. Id. at 623. As the officer caught up to defendant Hodari, he observed Hodari throw a small object that appeared to be a rock. Id. The officer tackled Hodari and handcuffed him. Id. A search of Hodari found $130 and a pager. Id. The rock which Hodari threw to the ground was later tested and determined to be crack cocaine. Id. Hodari was prosecuted in

juvenile court, where a motion to suppress was denied.  Id.  The California Court of Appeals

reversed, holding that Hodari had been seized when he saw the officer running towards him, and

that this seizure was unreasonable under the Fourth Amendment.  Id.  On certiorari review, the

Supreme Court held that Hodari had not been seized under the Fourth Amendment when the officer

gave chase, and hence the cocaine he discarded while he was running was not the fruit of an

unreasonable seizure.  The Court reasoned that in order to be seized by a "show of authority," an

individual must objectively feel that he is not free to leave.  Id. at 627-28 (citing United States v.

Mendenhall, 446 U.S. 544 (1980); Michigan v. Chesternut, 486 U.S. 567 (1988); Immigration and

Naturalization Serv. v. Delgado, 466 U.S. 210 (1984)).  The Court stressed that although Hodari

may not have felt free to go about his business, the issue was not whether he perceived that he was

being ordered to restrict his movement, "but whether the officer's words and actions would have

conveyed that to a reasonable person."  Hodari D., 499 U.S. at 628.  Thus, the Court concluded that

Hodari was not seized until he was tackled, and that the crack cocaine which he threw to the ground

was not the result of an unconstitutional seizure.

     Under the holding in Hodari D., Defendant was not seized within the meaning of the Fourth

Amendment at the time he discarded the drugs.  See, e.g., Salamacha v. Lynch, 165 F.3d 14, 1998

WL 743905 (2d Cir.1998) (police chase does not create Fourth Amendment seizure unless and until

there is physical seizure of the person); United States v. Batista, 1999 WL 33450, at *3-4 (S.D.N.Y.

Jan. 27, 1999) (no seizure of bag containing drugs abandoned during flight from police).  Therefore,

there is no basis for suppressing the quantity of crack cocaine on Fourth Amendment grounds, as no

seizure had taken place at the time Defendant allegedly threw the crack cocaine out the window.

"[T]o become seized...[, a suspect] must submit to police authority, for there is no seizure without

14

actual submission." <u>Baldwin</u>, 496 F.3d at 218 (quoting <u>Brendlin v. California</u>, __ U.S __, 127 S.Ct. 2400, 2405 (2007)).  Defendant did not actually submit to police authority and become seized until he pulled over on Clinton Avenue, after the crack cocaine was allegedly thrown out the window. Accordingly, Defendant's Motion to suppress the crack cocaine found on the street is denied.


### III.  Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendant's Motion to Suppress (Dkt. No. 49) is **DENIED**; and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED**.

DATED:      May 12, 2008
            Albany, New York

Lawrence E. Kahn
U.S. District Judge